# United States Court of Appeals

## For the Eighth Circuit

_____

No. 14-3405

_____

Lion Oil Company

*Petitioner*

v.

Environmental Protection Agency

*Respondent*

_____

Petition for Review of an Order of the
Environmental Protection Agency

_____

Submitted: June 11, 2015
Filed: July 8, 2015

_____

Before GRUENDER, BEAM, and BENTON, Circuit Judges.

_____

BENTON, Circuit Judge.

Lion Oil Company petitioned the Environmental Protection Agency for an exemption from the Renewable Fuel Standard program for 2013. EPA denied the petition. Lion Oil appeals. Having jurisdiction under 42 U.S.C. § 7607(b)(1), this court affirms.

The RFS program sets annual renewable-fuel targets for refineries. *See* **42 U.S.C. § 7545(o)**. Refineries must blend their share of renewable fuel or buy credits from those who exceed blending requirements. Congress exempted "small" refineries—75,000 barrels of crude oil or less per day—from RFS obligations until 2011. **§§ 7545(o)(1)(K)**, **7545(o)(9)(A)(i)**. The exemption can be extended. The Department of the Energy "shall conduct for [EPA] a study to determine whether compliance with [RFS requirements] would impose a disproportionate economic hardship on small refineries." **§ 7545(o)(9)(A)(ii)(I)**. If DOE determines a small refinery "would be subject to a disproportionate economic hardship if required to comply," EPA "shall extend the exemption . . . for a period of not less than 2 additional years." **§ 7545(o)(9)(A)(ii)(II)**. Also, "A small refinery may at any time petition [EPA] for an extension of the exemption . . . for the reason of disproportionate economic hardship." **§ 7545(o)(9)(B)(i)**. When evaluating such petitions, EPA, "in consultation with the Secretary of Energy, shall consider the findings of [DOE's] study . . . and other economic factors." **§ 7545(o)(9)(B)(ii)**.

DOE completed its study in 2011. It concluded, "Disproportionate economic hardship must encompass two broad components: a high cost of compliance relative to the industry average, and an effect sufficient to cause a significant impairment of the refinery operations." To implement these components, DOE created a dual-index scoring matrix. One index measures disproportionate structural and economic impact; the other, RFS compliance on refiner viability. The viability index has three metrics—3a ("Compliance cost eliminates efficiency gains"), 3b ("Individual special events"), and 3c ("Compliance costs likely to lead to shut down"). DOE defines "individual special events" as "Refinery specific events (such as a shutdown due to an accident, and subsequent loss of revenue) in the recent past that have a temporary negative impact on the ability of the refinery to comply with the RFS." Originally,

DOE scored all three metrics as 0 or 10. In a May 2014 addendum to the study, DOE added 5 as a possible score for metrics 3a and 3b (but not metric 3c).

Lion Oil, a small refinery in El Dorado, Arkansas, received exemptions through 2012. It petitioned EPA for an exemption for 2013. Citing disruption to a key supply pipeline and noting its "financial position has not improved," Lion Oil argued that RFS compliance would cause disproportionate economic hardship.

Before EPA considered the petition, DOE first scored Lion Oil on DOE's matrix, as amended by the addendum. DOE determined that Lion Oil did not score high enough on the viability index to show disproportionate economic hardship. Specifically, on metric 3b, DOE concluded the pipeline disruption was not an "individual special event" because "several refineries . . . were impacted by the reduced flow." (Lion Oil agrees that the pipeline disruption affected four other refineries.)

EPA's 23-page decision summarized DOE's analysis, a "primary factor" in its decision. EPA also said it "evaluate[d] viability . . . in the same manner that DOE considers viability in its own methodology." EPA did not re-score Lion Oil on DOE's matrix. Instead, EPA "independently" analyzed the pipeline disruption and Lion Oil's blending capacity, projected RFS-compliance costs, and financial position.

Lion Oil requested protection of "confidential business information." EPA sent its decision to Lion Oil only. At oral argument, Lion Oil's counsel said, "It's really just the specific numbers, the dollar amounts, the numbers of [credits] that are confidential."

Lion Oil appealed to this court under 42 U.S.C. § 7607(b)(1). The statute "lodges jurisdiction over challenges to 'any . . . final [EPA] action' in the Courts of Appeals." *Alaska Dep't of Envtl. Conservation v. E.P.A.*, 540 U.S. 461, 481 (2004),

*quoting* **§ 7607(b)(1)**. *See also **Whitman v. Am. Trucking Ass'ns***, 531 U.S. 457, 477 (2001) (stating § 7607(b)(1) "gives the court jurisdiction").

Section 7607(b)(1) has three parts. First, "A petition for review of . . . any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter may be filed only in the" D.C. Circuit. **42 U.S.C. § 7607(b)(1)**. Second, "A petition for review of the Administrator's action . . . which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit." ***Id.*** Third, "Notwithstanding the preceding sentence a petition for review of any action [that is locally or regionally applicable] may be filed only in the [D.C. Circuit] if such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination." ***Id.***

Lion Oil also appealed to the D.C. Circuit, which is holding that appeal in abeyance pending this court's decision. EPA then moved to dismiss this appeal, arguing the D.C. Circuit has exclusive authority to hear Lion Oil's appeal. This court took EPA's motion with the case. This court also granted Lion Oil's unopposed motion to seal EPA's decision and the parties' joint motion to file their briefs and appendix under seal.

II.

The parties agree that EPA's petition-denial is locally or regionally applicable, not nationally applicable. This court may hear a petition unless the denial "is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination." *See **id***.

In its decision, EPA stated, "This decision is a final agency action of nationwide scope and effect for purposes of [§ 7607(b)(1)]." EPA sent the decision to Lion Oil only. EPA made no announcement in any public record, including its website.

EPA argues, "Lion Oil's petition may only be heard in the D.C. Circuit because EPA has made an express and unambiguous determination of nationwide scope or effect." Lion Oil counters that EPA did not publish the necessary finding. Even if EPA published a finding, Lion Oil argues this court must independently conclude that EPA's action "is based on a determination of nationwide scope or effect."

Section 7607(b)(1) does not define "publishes." The parties do not cite cases or legislative history interpreting the term. "When a term is undefined, we give it its ordinary meaning." *United States v. Santos*, 553 U.S. 507, 511 (2008) (analyzing dictionary definitions of "proceeds" for purposes of money-laundering statute). The ordinary meaning of "publish" requires *some* public distribution. *See* **Webster's International Dictionary** 1837 (3d ed. 1961) (defining "publish" as "to declare publicly: make generally known"); **Black's Law Dictionary** 1428 (10th ed. 2014) (defining "publish" as "[t]o distribute copies (of a work) to the public"). *See also* **Webster's International Dictionary** 1836 (3d ed. 1961) (defining "public" as "of, relating to, or affecting the people as an organized community").

EPA does not assert a different meaning of "publish." Instead, EPA argues for an exception because it honored Lion Oil's request to protect certain confidential business information. But the plain language of § 7607(b)(1) permits no exception, and EPA cites no evidence of congressional intent to provide one.

At oral argument, EPA requested a remand "to allow the agency to follow the required procedure." Section § 7607(b)(1) is plain: An appeal of EPA action "which is locally or regionally applicable may be filed only in" the regional circuit *unless*, at

least, "the Administrator finds and publishes that such action is based on" a determination of nationwide scope or effect. *See* **42 U.S.C. § 7607(b)(1)**. Under the ordinary meaning of "publish," EPA must make public distribution of its decision, not just to the petitioner.

This court may hear Lion Oil's appeal because EPA did not publish the necessary finding.[1]

### III.

This court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." **5 U.S.C. § 706(2)(A)**. "[D]ue account shall be taken of the rule of prejudicial error." **§ 706**. This court "shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." ***Id.***

---

[1]While § 7607(b)(1) "gives the court jurisdiction," *Whitman*, 531 U.S. at 477, the parties treat § 7607(b)(1) as a venue provision. *See **Texas Mun. Power Agency v. E.P.A.**, 89 F.3d 858, 867 (D.C. Cir. 1996) ("Given the less than clear language, the structure of the section—dividing cases among the circuits—and the legislative history indicate that [§ 7607(b)(1)] is framed more as a venue provision."). Because EPA failed to publish a finding, this court need not reach whether § 7607(b)(1), particularly its third sentence, is also a venue provision—just as this court need not decide whether EPA's action "is based on a determination of nationwide scope or effect."

A.

Lion Oil argues that DOE's "scoring decision [on metric 3b] was flawed, and EPA acted arbitrarily and capriciously in using it is as a basis for its rejection of Lion Oil's petition."

"An agency decision is arbitrary or capricious if: the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *El Dorado Chem. Co. v. E.P.A.*, 763 F.3d 950, 955-56 (8th Cir. 2014). "The scope of our review is narrow and we are not to substitute our judgment for that of the agency." *Id.* at 956, *citing Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

EPA did not arbitrarily use DOE's scoring decision. Rather, EPA did as Congress directed—"in consultation with the Secretary of Energy, [EPA] consider[ed] the findings of [DOE's] study." *See* **42 U.S.C. § 7545(o)(9)(B)(ii)**. EPA said DOE's analysis was a "primary factor" in EPA's decision. EPA "evaluate[d] viability . . . in the same manner that DOE considers viability in its own methodology." EPA then "independently" analyzed the pipeline disruption, noting it "affected several other refineries, and thus was not a 'special event' specific to Lion." EPA also contextualized the disruption's impact on Lion Oil's financial position.

Lion Oil claims DOE's scoring "was flawed." To the extent Lion Oil can challenge DOE's scoring on metric 3b, it was proper. The study defined "individual special events" as "Refinery specific events (such as a shutdown due to an accident, and subsequent loss of revenue) in the recent past that have a temporary negative

impact on the ability of the refinery to comply with the RFS." Lion Oil agrees that the disruption affected four other refineries. By the study's definition, the disruption was not "refinery specific."

B.

Lion Oil's other arguments focus on DOE's addendum. Because EPA, not DOE, is the respondent, Lion Oil's theme is that DOE's scoring was "outcome-determinative." Even if DOE's scoring was "outcome-determinative," Lion Oil fails to show how the availability of an intermediate score prejudiced Lion Oil. *See* **5 U.S.C. § 706**.

1.

Lion Oil argues that the addendum was unlawful because it was not adequately explained. An agency must "provide reasoned explanation for its action" and "show that there are good reasons for the new policy." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). "But it need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id.*

In the addendum, DOE said metrics 3a and 3b measure "impacts that may occur across a continuum, and providing for the possibility of an intermediate score allows DOE to more accurately assess an individual refinery's economic situation." In its decision denying Lion Oil's petition, EPA noted, "DOE added a 5 as a possible intermediate score . . . to more accurately characterize the impacts of compliance costs (3a) or individual special events (3b) on a refinery."

Lion Oil argues that DOE and EPA offered "not an explanation for the change but merely a description of it." To the contrary, DOE and EPA provided a "reasoned explanation" and "good reasons." *See id.* The intermediate score "allows for more nuanced and accurate characterization of the" refinery's situation. *See **Hermes Consol., LLC v. E.P.A.**,* 2015 WL 3461360, at \*5, \*10 (D.C. Cir. June 2, 2015) (vacating EPA's denial of small refinery's exemption petition because EPA conceded it made two miscalculations about petitioner's financial data).

2.

Lion Oil argues that the addendum required notice-and-comment rulemaking. "Agencies must conduct 'rule making' in accord with the [Administrative Procedure Act's] notice and comment procedures." ***Iowa League of Cities v. E.P.A.***, 711 F.3d 844, 855 (8th Cir. 2013). *See* **5 U.S.C. § 553** ("Rule making"). "However, only new 'legislative' rules are required to be created pursuant to notice and comment rulemaking," not "interpretative rules" or "general statements of policy." ***Iowa League of Cities***, 711 F.3d at 855.

According to Lion Oil, the addendum is "a legislative rule" because EPA "gave [the addendum] conclusive effect." Lion Oil cites *General Electric Company v. E.P.A.*, 290 F.3d 377, 383 (D.C. Cir. 2002): "[A]n agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding."

Lion Oil's factual premise fails. EPA did not give the addendum "conclusive effect," nor could it, as EPA does not score petitions on DOE's matrix. Rather, EPA did as Congress directed—"in consultation with the Secretary of Energy, [EPA] consider[ed] the findings of [DOE's] study . . . and other economic factors." *See* **42 U.S.C. § 7545(o)(9)(B)(ii)**. EPA said DOE's analysis was a "primary factor" in EPA's decision, and EPA "evaluate[d] viability . . . in the same manner that DOE

considers viability in its own methodology." EPA also "independently" analyzed the pipeline disruption and Lion Oil's blending capacity, projected RFS-compliance costs, and financial position. *See **Hermes***, 2015 WL 3461360, at \*6 (rejecting argument that addendum required notice-and-comment rulemaking because petitioner "points us to no authority suggesting that the decision to make available a more refined score within an already-existing metric requires notice-and-comment procedures" and finding "no basis for creating such a rule").

3.

Lion Oil argues that EPA unreasonably interpreted "disproportionate economic hardship" to mean long-term viability, particularly as credits became more costly. "Where a statute does not define a term, and Congress has delegated authority to an agency to implement an ambiguous statute, we are required to accept the agency's statutory interpretation, so long as it is reasonable." ***Fast v. Applebee's Int'l, Inc.***, 638 F.3d 872, 876 (8th Cir. 2011), *citing **Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.***, 467 U.S. 837, 844-45 (1984).

EPA's interpretation of "disproportionate economic hardship" is reasonable. "[T]he relative costs of compliance alone cannot demonstrate economic hardship because all refineries face a direct cost associated with participation in the program. Of course, some refineries will face higher costs than others, but whether those costs impose disproportionate *hardship* on a given refinery presents a different question." ***Hermes***, 2015 WL 3461360, at \*5. EPA adopted DOE's determination "that the best way to measure 'hardship' entailed examining the impact of compliance costs on a refinery's ability to maintain profitability and competitiveness—*i.e.*, viability—in the long term." ***Id.*** "[T]hat choice lies well within the agency's discretion." ***Id.***

-10-

4.

Lion Oil argues the addendum's "arbitrariness . . . is heightened by EPA's failure to apply the revised scoring methodology consistently." Lion Oil cites a letter from EPA to the D.C. Circuit in the *Hermes* case. There, EPA acknowledged that DOE gave some pre-addendum petitioners a 5 for metrics 3a and 3c—when a 5 was not yet an option (and still is not for metric 3c).

Again, EPA, not DOE, is the respondent here. Lion Oil does not show that EPA relied on DOE's scoring decisions in *those* petitions. Even if EPA did, *Lion Oil* was not prejudiced. *See* **5 U.S.C. § 706**.

\* \* \* \* \* \* \*

EPA's denial of Lion Oil's petition is affirmed.

_____